[No. 38499.   Department One.   December 22, 1966.]

ALFRED F. SIMONSON *et al., Respondent and Cross-appellants,* v. "U" DISTRICT OFFICE BUILDING CORPORATION, *Appellant.*\*

\*Reported in 422 P.2d 1.

*Oscar A. Zabel* and *Kenneth Davis*, for appellant.

*Melville Monheimer, Jr.* (of *Monheimer, Schermer, Van Fredenberg & Smith*), for respondents and cross-appellants.

LANGENBACH, J.†—Plaintiffs are architects suing to recover for services performed for defendant corporation. (The Metropolitan Life Insurance Company was a nominal defendant and will not be further mentioned.) Since both parties are appealing they will be referred to by their original designations; plaintiffs will be referred to as Simonson.

The trial was to the court and over a period of days some 117 exhibits were received. We have examined those exhibits and have digested the nearly 800 page statement of facts. There was testimony and proof from which the trial court could have found the following facts and circumstances.

The officers of defendant are Potter, Zabel, and Coppage. Prior to 1957, Potter, Zabel, and one Schmid were the officers of Schmid Construction Company which had constructed a hospital at Burien, near Seattle. In 1958, they incorporated Pioneer Development and Investment Corporation[1] which built a hospital at Lakewood, near Tacoma. The contracts between the hospital associations (which owned the hospitals after construction) and the construction companies, required the construction companies to obtain financing and to construct the hospitals. Potter and Zabel handled the financing details and Schmid, an experienced contractor, arranged all phases of construction.

Simonson had been employed to furnish architectural services for both hospitals. He drew such plans and specifications as the general contractor, Schmid, required. Zabel,

†Judge Langenbach is serving as a judge pro tempore of the Supreme Court pursuant to Art. 4, § 2(a) (amendment 38), state constitution.

[1]The name of this corporation was later changed to Schmid Construction Corporation, and still later to Pioneer Development Corporation, the assets of which were later transferred to Pioneer Associates, Inc.

an attorney, prepared the necessary contracts and performed legal services.

In 1959, Potter and Zabel met Coppage, a realtor, who interested them in building a structure in the University District of Seattle on property upon which he held an option. They agreed to form the defendant corporation and also, in 1959, entered into a construction contract with Pioneer Associates, another corporation owned by Potter and Zabel. (Pioneer Associates seems to have been formed in order to get rid of Schmid's interests in the various projects. It was not formally incorporated until 1961, and all of the assets of Pioneer Development Corporation were transferred to it.)

In July 1960, Potter, Zabel, Coppage, and Schmid met with Simonson relative to his employment as architect for defendant. On August 3, Simonson delivered a proposed contract of employment, on a standard form, to Zabel. Potter, Zabel, and Schmid were not satisfied with its terms. They wanted to cut Simonson's fees to 4 per cent of construction costs because he was not expected to perform all of the normal architectural services as had been done on the two prior hospital contracts.

After further discussion the contract was redrafted. There would be no competitive bidding; Schmid would not need detailed plans and specifications as he would be doing the work himself. He would also supervise the work himself. Deletions were accordingly made in paragraphs C(1), (2), and (3) and the contract was finally executed.

Following the execution of the contract, Potter and Zabel had a disagreement with Schmid and the latter had nothing further to do with the construction of defendant's building. Without Schmid, defendant had no one capable of performing his job as general contractor. Potter then, as representative of his associates and of defendant, informed Simonson that he would have to perform additional functions and provide additional services. Those services were generally, those set forth in paragraphs C(1), and (3) of the contract, which paragraphs had previously been stricken.

Simonson then made extra plans and specifications for competitive bidding from subcontractors. Potter, Zabel, and Coppage were kept informed of progress. Plans and specifications were delivered to them in January 1961. They approved of the plans and instructed Simonson to get subcontractors and bids, and to proceed with the building of the structure.

In May 1961, the Lakewood Hospital had its formal opening and Potter and Zabel terminated their relations with Schmid. (He was finally paid off in July 1961.) John Shelman had been job superintendent under Schmid on the Lakewood Hospital and after Schmid's disappearance, became construction superintendent of defendant's building. As such he kept in close touch with Simonson during the construction of the building. He admitted he was not a contractor.

The defendant's building was to be built as a "loft construction" in which no partitions would be placed until the tenants had been procured and had requested specific partitions. In June 1962, the building was substantially completed with the exception of the partitions. Final costs were computed. (Simonson had been paid certain amounts during the course of construction.) Later a dispute arose between the parties concerning extra services. Simonson filed a lien in June 1963.

Defendant asserted a counterclaim based upon an assignment from the Lakewood Hospital for some $110,000 damages alleged to have been sustained by that hospital because Simonson had not properly procured approval from the State Department of Health, with the result that a portion of that building had to be replaced.

At the conclusion of the trial, the court allowed Simonson a recovery for certain extras, denied his claim of lien, and dismissed the counterclaim. Both parties have appealed from the resultant judgment.

Defendant alleged 29 assignments of error grounded primarily upon the findings of fact and conclusions of law entered by the trial court. Many of the issues are factual. An examination of the voluminous record disclosed to our

satisfaction that there was substantial proof, both oral and documentary, which the trial court was entitled to believe and which sustains the findings of that court.

■ What was said in *Brooks v. Warner*, 50 Wn.2d 99, 102, 309 P.2d 757 (1957), is determinative of this phase of the appeal:

> The trial court, which had the opportunity to observe the witnesses, chose to believe respondent's evidence and found that the parties had agreed to share losses as well as profits. We are governed on appeal by the rule that the trial court is better qualified to judge the weight to be given to conflicting testimony than this court. Consequently, the trial court's findings of fact, entered upon conflicting testimony, will be accepted as the facts of the case, unless we can say that the evidence preponderates against such findings. [Citing cases.] In the case at bar, we cannot say that the evidence preponderates against the trial court's finding as to the nature of the agreement intended by the parties.

We will now consider the legal arguments brought here by the defendant. Those arguments have been built primarily upon the defendant's view of the facts, notwithstanding the trial court's findings. Our decision that there was substantial evidence to support the trial court's findings confirms those findings as the facts of this case. It is upon the facts as found by the trial court, and not as claimed by defendant, that the law will be applied.

■ Defendant denied that on these facts a court could properly find an implied contract in law. The facts revealed that when Schmid left, Potter, with the knowledge of his fellow officers, specifically requested the architect to perform a large number of additional duties not contemplated by the parties as falling within the terms of the existing, written contract. The architect performed those duties. This conduct of the parties clearly manifested a mutual undertaking. The performance of the additional duties in response to a request that such additional duties be performed, implies a promise that the performance will be paid for. The trial court was correct in treating that prom-

ise as good as a written one and ordering that such promise be kept.

Defendant argued further that Simonson did what he was already obligated to do under the written contract; that there was, therefore, no consideration for any implied promise to pay any additional sum. The facts do not support that argument. They revealed rather that Simonson was asked to do what had been specifically deleted from the written contract. Hence, there was ample consideration given for defendant's implied promise to pay him for such additional, uncontracted for, service.

In *Gannon v. Emtman*, 66 Wn.2d 755, 760, 405 P.2d 254 (1965), this court said:

> [A]ppellant relies upon the general rule to the effect that a promise to pay additional compensation for the doing of, or a promise to do, that which the promisee is already under contractual obligation to do is lacking in consideration. [Citing cases.]
>
> There are, however, some exceptions to this general rule. One of the recognized exceptions is that there is consideration for a subsequent contract which involves the doing of something which was not either expressly or by implication a part of the existing contract or was not contemplated by the parties as falling within the terms of the existing contract. [Citing cases.]

The additional services requested from the architects were not "either expressly or by implication a part of the existing contract [and were] not contemplated by the parties as falling within the terms of the existing contract."

Defendant also argued that the parol evidence rule barred evidence to establish a contract that is contemporary with or prior to a written contract. It should be sufficient to note that Simonson was asked to perform additional services *after* the written agreement was entered into. The very event which made necessary Simonson's additional services did not occur until after the contract was executed. It should not be necessary to point out that the parol evidence rule does not prevent proof of an agreement which is made subsequent to a prior written contract however much the latter contradicts the terms of

the former. In view of this we need only note that we agree with defendant's four-page argument that ambiguity in contracts is a question of law.

Finally we reach defendant's argument that Simonson is estopped and has waived any right to establish an implied contract. It appeared that Simonson once described the change which occurred in his relations with defendant as a "change." Upon this defendant based its argument that Simonson was required at the time of the change to "announce" it or "protest" it. By not doing so he is said to have waived and to be estopped from raising the "change." Why Simonson should be required to announce to defendant a change which defendant had announced to him and why Simonson should protest a change inuring to his benefit, is not clear. We think defendant's argument is singularly without merit.

During the course of construction Simonson received payments from time to time under the contract. These payments were not limited as to their application. It was not until the building was completed and the costs computed (which costs were to form the basis for Simonson's fees) that questions of final payment could be settled. It was not necessary that the question be considered prior to that time.

The trial court did not err in allowing Simonson additional compensation. Simonson, however, cross appealed on the ground that he was not allowed sufficient additional compensation, and on the further ground that his lien should not have been dismissed.

The building, as mentioned above, was to be built as a "loft construction" in which no partitions would be placed until tenants had been found and had requested specific partitions. Under the contract, Simonson's fees were to be computed from the cost of construction, which itself was not to be determined until the building was completed. This arrangement raised certain questions. Is the building not completed until it is filled with tenants and all of the partitions have been built and installed? If this were the case there would be little doubt but that the cost of parti-

tions was to be included in the cost of construction on which Simonson's fees were calculated. But, if the building is complete without the partitions, what of the cost of those partitions?

The trial court did not particularly find a precise date upon which the building was finished. Simonson argued that the building was not to be considered completed until it was full of tenants and all partitions built and installed. Defendant did not agree. The trial court's conclusions were clearly based on a belief that the building was completed in 1962 before any tenants were engaged. For example, the court awarded Simonson interest on unpaid fees from June 1962. What we are searching for is some evidence of the parties' intentions and their conduct is some evidence of that. In June 1962, Potter wrote Simonson stating that for all practical purposes the building was complete and setting out a tentative list of the construction costs on which Simonson's fees were based. From that point on Simonson began trying to get an audit so that the "fee payment [could be] settled on the basis of the contract." Because the fees of the architect were not to be settled until the building was completed, Simonson's strenuous efforts then to get an audit are not entirely consistent with his argument that the building was not yet finished.

The trial court did not believe that the parties intended to hold up the final settlement of fees until the building was filled with tenants, whenever that might be. We agree. But this conclusion led the court to hold that none of the partitioning work was to be included in the cost of construction. With this we disagree.

If the cost of partitions was intended to be included in the cost of construction, and the cost of construction was to be determined upon the completion of the building in 1962, then the parties must have intended either to include in the settlement the estimated costs of those partitions or to include only those partition costs incurred prior to the final settlement. There is no evidence to support the first possibility. There is evidence which supported the second.

First, in June 1962, Potter wrote Simonson saying: "For all practical purposes, the 'U' District Office Building is now complete and we are able to compute very accurately, the total direct construction costs upon which your fee is based. . . . Partition materials . . . ." S e c o n d, the defendant had prepared and delivered to Simonson an audit entitled "Auditor's Report of Construction Costs" which set out the partition costs incurred. Those costs amounted to $60,061.14. Simonson argued that such costs were a part of the construction costs as defendant had included those costs in its statement of the construction costs. We believe and hold that Simonson should have been awarded 4 per cent of $60,061.14.

The other assignment of error by Simonson is that he was wrongfully denied a claim of lien. It should first be noted that Simonson's duties under the contract were not at an end simply because the building had been completed. A section had been added to the contract which read: "Additional Work: (if requested) Individual office design layouts will be based on $8.00/hr. charge . . . for Tenants." The trial court, in its oral decision, stated that "[I]n so far as partitions were concerned . . . the only compensation to be given to the architects for partitions was to be the sum of $8.00 per hour as the work was done and requested, . . . ." To the extent that this applied to work done after the building was completed, we agree. The trial court held that "[T]he evidence is quite clear that at least by September of 1962 both Mr. Dersham and Mr. Simonson were advised categorically that they had nothing more to do with the project. . . ." No further substantial work or services were performed thereafter. The lien was not filed until June 1963.

Simonson claimed a lien on two grounds. The first, that the building was not to be completed until all partitions were installed, has been disposed of above. The second was that because Simonson was recalled to the project, the time within which a lien could be filed was extended accordingly. The trial court was not entirely convinced that the architect had not himself offered to go out to the project to

climb up and down a stepladder. The trial court further felt that even if one O'Laughlin had asked the architect to come out, there was "[C]ertainly no evidence here that O'Laughlin had sufficient authority, apparent or actual, to bind the defendant . . . ." The court held that the filing of the lien was not timely. We agree.

Finally, our discussion must turn to defendant's appeal from the dismissal of its counterclaim. This claim, as noted, was based on an assignment from the Lakewood Hospital for some $110,000 in damages alleged to have been sustained by that hospital because Simonson had not properly procured approval from the State Department of Health, with the result that a part of that building had to be replaced. The trial court found, however, that the construction had been commenced before the plans had been approved by the Department of Health or Fire Marshal; that Simonson had no control after he advised against such commencement; that the corporation officers were anxious to get construction started so as to expedite public financing; and that this was done under Potter's direction.

This was a dispute of fact which the court had a basis to resolve in favor of Simonson. In addition, there was no tangible proof that defendant's assignor, Lakewood Hospital Association, suffered any financial or other loss. The evidence showed that possibly one of Schmid's corporations may have suffered loss by reason of the lack of a proper permit. There was nothing in the evidence to show that such loss, if any, was thereafter charged to or assigned to this hospital, or that its final costs were thereby enlarged. In the absence of such positive proof, the trial court was justified in dismissing the counterclaim and in such dismissal we concur.

It is our considered determination that the judgment of the trial court must be affirmed in all particulars except the plaintiffs are allowed an additional amount equal to 4 per cent of $60,061.14. The judgment is modified to that extent and the case is remanded for the entry of a suitable judgment.

Plaintiffs will recover their costs on appeal. It is so ordered.

ROSELLINI, C. J., OTT, HUNTER, and HALE, JJ., concur.

---

February 24, 1967. Petition for rehearing denied.