[No. 2856-2. Division Two. February 28, 1978.]

SOUTHWEST WASHINGTON PRODUCTION CREDIT ASSOCIATION, *Respondent,* v. SEATTLE–FIRST NATIONAL BANK, *Appellant.*

*Marvin L. Gray, Jr.,* for appellant.

*James A. Vander Stoep,* for respondent.

SOULE, J.—Seattle–First National Bank (Sea–First) appeals from a declaratory judgment in favor of Southwest Washington Production Credit Association (PCA) holding that the PCA had a security interest in certain farm products in the hands of a purchaser and that that security interest had priority over Sea–First's interest in the same collateral. We reverse.

Symons Frozen Foods, Inc., was a food processor financed by Sea–First Bank. Sea–First held a valid security interest in several of Symons' assets including inventory. Part of the inventory consisted of corn, peas, and berries purchased by Symons from Aldrich, Goeres, and Drew. Aldrich, Goeres, and Drew were farmers who were financed by loans from the PCA which held a security interest in their crops.

Before planting time each spring, each farmer would go to the PCA and obtain a loan. The PCA would prepare a security–agreement in which the farmer would pledge most of his assets, including crops, as collateral. The agreement consisted of a standard form which stated, among other things, that the debtor–farmer would not sell the collateral without obtaining written authorization from the secured party, PCA. At the time the security agreement was

entered into, the PCA prepared a financial assessment or budget showing the income that each farmer expected to realize from the sale of his crops. The PCA loan officer, Joseph Cooke, testified by deposition that he expected the loans to be repaid as the farmers received payment from the producer Symons. He knew that the farmers would be selling their crops to Symons without written authorization from the PCA; he said he relied on the farmers' honesty to insure that the proceeds from those sales reached PCA. The farmers had each dealt with the PCA for over a decade and at no time had the PCA ever enforced its no–sales–without–written–authorization clause against them.

In dealing with Symons, the farmers were paid for their crops in three installments. The first payment was 50 percent of the value of the crop and was paid within a few days of delivery. Twenty–five percent was paid 3 months later and the remaining 25 percent was paid 6 months later. In 1976, Symons became insolvent and was not able to finish paying off the farmers who in turn did not pay the PCA for part of their 1975 crop loans. The PCA sought to cover their losses by claiming a security interest in the farmers' products which were in the possession of the purchaser, Symons. RCW 62A.9–307(1).[1] This claim was opposed by Sea–First which argued that the PCA had authorized the farmers to sell the farm products to Symons and, therefore, waived its security interest under RCW 62A.9–306(2).[2] Sea–First conceded that if the PCA's security interest continued through to Symons, then the PCA's interest would have priority over Sea–First's interest.

---

[1] RCW 62A.9–307(1) reads:

"A buyer in ordinary course of business (subsection (9) of RCW 62A.1–201) other than a person buying farm products from a person engaged in farming operations takes free of a security interest created by his seller even though the security interest is perfected and even though the buyer knows of its existence."

[2] RCW 62A.9–306(2) reads:

"Except where this Article otherwise provides, a security interest continues in collateral notwithstanding sale, exchange or other disposition thereof by the debtor unless his action was authorized by the secured party in the security

In order to settle the dispute, the PCA sought a declaratory judgment against Sea–First which impleaded the farmers as third–party defendants. After reviewing the various security agreements, the budgets prepared by the PCA, and the depositions of Aldrich, Goeres, Drew and Joseph Cooke, the trial court found that the PCA had assented to the sale of the farm products to Symons but that the assent was "conditioned upon" PCA's receipt of the proceeds. Consequently, the court concluded that the PCA's security interest continued in the farm products which Symons purchased and was superior to Sea–First's security interest in Symons' inventory. See RCW 62A.9–312(5).[3]

On appeal, Sea–First contends that the record does not support the trial court's findings that the PCA's consent to the sale of the crops was conditioned on PCA's subsequently receiving the proceeds of the sale. Specifically, Sea–First assigns error to the following findings and conclusions:

### Finding of Fact No. 3

In providing financing to Symons the defendant knew that Symons obtained the corn, peas, and berries from third party defendants and other farmers, and one purpose of such financing was to provide funds to acquire and pay for such products. The defendant knew that plaintiff had a security interest in the farm products of third party defendants, and knew that the plaintiff and

---

agreement or otherwise, and also continues in any identifiable proceeds including collections received by the debtor."

[3]RCW 62A.9–312(5) reads:

"In all cases not governed by other rules stated in this section (including cases of purchase money security interests which do not qualify for the special priorities set forth in subsections (3) and (4) of this section), priority between conflicting security interests in the same collateral shall be determined as follows:

"(a) in the order of filing if both are perfected by filing, regardless of which security interest attached first under RCW 62A.9–204(1) and whether it attached before or after filing;

"(b) in the order of perfection unless both are perfected by filing, regardless of which security interest attached first under RCW 62A.9–204(1) and, in the case of a filed security interest, whether it attached before or after filing; and

"(c) in the order of attachment under RCW 62A.9–204(1) so long as neither is perfected."

third party defendants expected to be paid therefor by Symons.

### Finding of Fact No. 8

The plaintiff, defendant, third party defendants and Symons all knew that plaintiff's security interest was to be discharged by receipt from Symons of the proceeds of the crop. Plaintiff's knowledge that the crops would be delivered to Symons and plaintiff's assent thereto were conditioned upon plaintiff's receipt of such proceeds.

### Conclusion of Law No. 1

All parties to this action and Symons know that the security interest of plaintiff in the farm products of third party defendants was to continue until payment for such product was made by Symons.

### Conclusion of Law No. 2

Any assent by plaintiff to delivery of the farm products to Symons was conditioned upon the proceeds therefor being forthcoming and remitted to plaintiff.

■ Although the facts of this case are somewhat novel, the general principles have been analyzed by many courts, including Division Three of this Court. *See Central Wash. Prod. Credit Ass'n v. Baker,* 11 Wn. App. 17, 521 P.2d 226 (1974). The principal issue is whether a buyer of farm products is able to purchase free of any security interest by showing that the security interest has been waived.

A "waiver" is the intentional and voluntary relinquishment of a known right, or such conduct as warrants an inference of the relinquishment of such right. The person against whom a waiver is claimed must have intended to relinquish the right, advantage, or benefit, and his actions must be inconsistent with any other intention than to waive them.

To constitute a waiver other than by express agreement, there must be unequivocal acts or conduct . . . evincing an intent to waive.

(Citation omitted.) *Birkeland v. Corbett,* 51 Wn.2d 554, 565, 320 P.2d 635 (1958). *See also State ex rel. Madden v. PUD 1,* 83 Wn.2d 219, 517 P.2d 585 (1973); *Bonanza Real Estate, Inc. v. Crouch,* 10 Wn. App. 380, 517 P.2d 1371 (1974); *Gorge Lumber Co. v. Brazier Lumber Co.,* 6 Wn.

App. 327, 493 P.2d 782 (1972); 28 Am. Jur. 2d *Estoppel & Waiver* §§ 154–60 (1966).

RCW 62A.9–307(1) of the Uniform Commercial Code states that a person buying farm products from a person engaged in a farming operation takes the products subject to any security interest in them. *See also* RCW 62A.9–201. However, the code also provides that a security interest will not continue in collateral which is sold, exchanged, or otherwise disposed of if the disposition "was authorized by the secured party in the security agreement or otherwise." RCW 62A.9–306(2). The weight of authority is that this latter provision codifies the common–law waiver. *Swift & Co. v. Jamestown Nat'l Bank,* 426 F.2d 1099 (8th Cir. 1970); *United States v. Greenwich Mill & Elevator Co.,* 291 F. Supp. 609 (N.D. Ohio 1968); *Vermilion County Prod. Credit Ass'n v. Izzard,* 111 Ill. App. 2d 190, 249 N.E.2d 352 (1969).[4] Thus it is clear that the PCA, which had a security interest that was good even as against a buyer in the ordinary course of business, could waive that interest by authorizing the sale of the collateral.

The second issue, then, is what actions constitute a waiver. RCW 62A.9–306(2) provides that waiver or authorization may be shown by express agreement "or otherwise." Obviously, there was no express waiver in the case at bench; to the contrary, the agreement stated that sale or removal of the collateral was conditioned upon the debtor "first having obtained the written consent of the secured

---

[4]Even though several courts have found no waiver of a security interest in cases similar to the one here, they implicitly recognize that, under appropriate facts, a waiver could exist. *United States v. E.W. Savage & Son, Inc.,* 343 F. Supp. 123 (D.S.D. 1972), *aff'd,* 475 F.2d 305 (8th Cir. 1973); *Imperial NH3, Inc. v. Central Valley Feed Yards, Inc.,* 70 Cal. App. 3d 513, 139 Cal. Rptr. 8 (1977); *Wabasso State Bank v. Caldwell Packing Co.,* 308 Minn. 349, 251 N.W.2d 321 (1976); *Colorado Bank & Trust Co. v. Western Slope Invs., Inc.,* 36 Colo. App. 149, 539 P.2d 501 (1975); *Farmers State Bank v. Edison Non–Stock Co-op Ass'n,* 190 Neb. 789, 212 N.W.2d 625 (1973); *Baker Prod. Credit Ass'n v. Long Creek Meat Co.,* 266 Ore. 643, 513 P.2d 1129 (1973); *Garden City Prod. Credit Ass'n v. Lannan,* 186 Neb. 668, 186 N.W.2d 99 (1971). *But see First Nat'l Bank v. Calvin Pickle Co.,* 11 UCC Rep. Serv. 1245 (Okla. App. 1973).

party." Therefore, if a waiver exists it must be implied from the conduct of the secured party, PCA. *Cf. Buchanan v. Switzerland Gen. Ins. Co.,* 76 Wn.2d 100, 455 P.2d 344 (1969) (waiver is a unilateral action). The official comments to the code indicate that any words or conduct of the parties may be used to infer a waiver. *See* Official Comment 3, RCWA 62A.9–306; Official Comment 2, RCWA 62A.9–307. *See generally Central Wash. Prod. Credit Ass'n v. Baker, supra.*

Under pre–code law the theory of implied consent to sell and waiver of lien was an accepted concept, even when a chattel mortgage required written consent. If a secured party consented to sale of the collateral with an understanding that the proceeds would be paid over to him by the seller, then he waived his security interest. *See* Annot., 97 A.L.R. 646 (1935). While these common–law principles have been incorporated into article 9 of the code, they only supplement the statutory language. RCW 62A.1–103. Thus, before we examine the record for an implied waiver, we must consider to .what extent the common–law doctrine of waiver contained in RCW 62A.9–306(2) may be modified by other provisions of the code. *See Gorge Lumber Co. v. Brazier, supra.*

Where the security agreement provides that the sale of the collateral is unauthorized without the written consent of the secured party, some courts have concluded that a course of dealing which is inconsistent with the agreement constitutes a waiver. *Hedrick Sav. Bank v. Myers,* 229 N.W.2d 252 (Iowa 1975); *Clovis Nat'l Bank v. Thomas,* 77 N.M. 554, 425 P.2d 726 (1967); *Central Wash. Prod. Credit Ass'n v. Baker,* 11 Wn. App. 17, 521 P.2d 226 (1974) (alternate holding).[5] These cases have been severely criticized for

---

[5]Obviously, in the absence of any provision in the security agreement requiring written authorization to sell, a course of dealing between the parties indicating consent to sale of the collateral is conduct which establishes waiver. RCW 62A.1–205(3). *See United States v. Central Livestock Ass'n,* 349 F. Supp. 1033 (D.N.D. 1972); *Planters Prod. Credit Ass'n v. Bowles,* 256 Ark. 1063, 511 S.W.2d 645 (1974); *Lisbon Bank & Trust Co. v. Murray,* 206 N.W.2d 96 (Iowa 1973).

ignoring RCW 62A.1–205(4) which states that where the written agreement of the parties is inconsistent with their course of dealing or usage of trade, the written agreement controls. *See* Miller, *Farm Collateral Under the UCC: "Those Are Some Mighty Tall Silos, Ain't They Fella?"*, 20 S.D. L. Rev. 514 (1975); Comment, *"Farm Products" Under the UCC—Is a Special Classification Desirable?*, 47 Tex. L. Rev. 309 (1969); 20 Baylor L. Rev. 136 (1967); 17 DePaul L. Rev. 447 (1968); 8 Nat. Resources J. 183 (1968). *See also Wabasso State Bank v. Caldwell Packing Co., supra.* We are persuaded that these criticisms are justifiable and we disagree with *Central Wash. Prod. Credit Ass'n v. Baker, supra,* to the extent that it implies that a prior course of dealing without more is sufficient to waive a written agreement to the contrary. Nevertheless, we are of the opinion that any course of *performance,* RCW 62A.2–208,[6] or other conduct *subsequent* to the agreement can amount to a waiver. *See Swift & Co. v. Jamestown Nat'l Bank, supra; Central Wash. Prod. Credit Ass'n v. Baker, supra; cf. Bunn v. Walch,* 54 Wn.2d 457, 342 P.2d 211 (1959) (pre–U.C.C. case).

RCW 62A.1–205(4) has two purposes: first, it compliments the parol evidence rule regarding the interpretation of written agreements, *see* J. Calamari & J. Perillo, *The Law of Contracts* §§ 3–13 to –15 (2d ed. 1977); J. White & R. Summers, *Handbook of the Law Under the Uniform Commercial Code* § 3–3 (1972); second, it gives parties to a

---

[6]RCW 62A.2–208 reads:

"(1) Where the contract for sale involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any *course of performance* accepted or acquiesced in without objection shall be relevant to determine the meaning of the agreement.

"(2) The express terms of the agreement and any such course of performance, as well as any course of dealing and usage of trade, shall be construed whenever reasonable as consistent with each other; but when such construction is unreasonable, express terms shall control course of performance and course of performance shall control both course of dealing and usage of trade (RCW 62A.1–205).

"(3) Subject to the provisions of the next section on modification and waiver, such *course of performance* shall be relevant to show a waiver or modification of any term inconsistent with such course of performance." (Italics ours.)

series of contracts the freedom to change their relationship by agreement. *See* 20 Baylor L. Rev. 136 (1967). It is apparent that neither of these purposes is frustrated by permitting waiver to be implied from conduct subsequent to the written agreement. The parol evidence rule has no applicability in such instances, *see Simonson v. "U" Dist. Office Bldg. Corp.*, 70 Wn.2d 35, 422 P.2d 1 (1966); Annot., 55 A.L.R. 700 (1928), and there is no inhibition on the ability of the parties to write an agreement which varies from their past dealings. Furthermore, the code expressly states that subsequent conduct can effect a waiver. RCW 62A.2–208(3) and Official Comment 3; *see also* Washington Comment 2, RCWA 62A.9–306.

With the foregoing principles in mind we note that subsequent to entering into the security agreements with Aldrich, Goeres, and Drew, the PCA's conduct and communications regarding the sale of the farm products to Symons were as follows:

(1) The PCA had frequent contacts with the farmers during the growing season and, consequently, knew that Aldrich, Goeres, and Drew would and did sell their crops to Symons.

(2) The PCA lent money and received repayment from the farmers in accordance with the previously prepared budgets which were predicated upon the sale of the crops.

(3) Mr. Cooke, assistant manager of the PCA, agreed with the statement that "as long as the grower was meeting the repayment schedule in his budget [I] considered him in compliance with the security agreement."

(4) The PCA acquiesced in Symons' deduction of certain crop expenses from the purchase price of the crops. Such acquiescence is inconsistent with the PCA's assertion that it retained a security interest in the entire crop.

(5) The PCA exhibited no concern for the security of its collateral when informed by the farmers that the collateral had been sold on credit.

(6) At trial the following interpretation of the no–sales–without–written–consent clause was given:

COUNSEL FOR SEA–FIRST BANK: I'm still having problems. Your interpretation of this clause that speaks of the written consent of the Secured Party is that it is simply to require the grower to meet the payment schedule that he's worked out with you and to live up to the other obligations of his dealings with you?

MR. COOKE: That would be a fair statement.

We think the conduct of the PCA evinced an intent to waive its security agreement because PCA consented to the sale of the crops and merely had an understanding with the farmers that when they were paid by Symons, the proceeds would be paid over to it by the farmers. *See In re Cadwell, Martin Meat Co.,* 10 UCC Rep. Serv. 710 (E.D. Cal. 1970). Therefore, the PCA's security interest did not continue in the crops in the hands of the purchaser, Symons.

PCA contends that its consent to the sale was conditioned on Symons' paying for the crops and that when Symons failed to make payment the condition was broken so that the security interest continued. We note that the trial court, relying on *Baker Prod. Credit Ass'n v. Long Creek Meat Co.,* 266 Ore. 643, 513 P.2d 1129 (1973), agreed with this argument and concluded that there was an implied condition. We cannot accept this conclusion because (a) it is not supported by the evidence and (b) the *Baker* PCA case is clearly distinguishable.

■ Generally, we review the record only to determine whether there is substantial evidence to support the trial court's finding of fact. *Thorndike v. Hesperian Orchards, Inc.,* 54 Wn.2d 570, 343 P.2d 183 (1959). However, where the entire relevant evidence is documentary or in the form of depositions, as here, we may substitute our judgment for the trial court's. *In re Estate of Reilly,* 78 Wn.2d 623, 479 P.2d 1, 48 A.L.R.3d 902 (1970). Our review of the record discloses no evidence to support the finding of an implied condition to the PCA's consent.[7] All of the testimony and

---

[7]The depositions of Aldrich, Goeres, and Drew were submitted to the trial court by stipulation as evidence on the authorization issue. Pertinent portions are reprinted below:

the loan repayment schedule are consistent with the conclusion that the PCA was relying on the farmers' credit and does not indicate that the PCA was placing a condition on the sale. *See Swift & Co. v. Jamestown Nat'l Bank, supra.* At best, the PCA only had an expectation that Symons would pay the farmers.

"COUNSEL FOR SEA–FIRST BANK: Does Joe Cooke or any other P.C.A. representative, more or less, have constant contact with you during the course of the year as to how your crop is coming and so on?

"MR. ALDRICH: Pretty well, yes.

"COUNSEL FOR SEA–FIRST BANK: And do they know to whom you're selling your crop and all of these things?

"MR. ALDRICH: Yes.

". . .

"COUNSEL FOR SEA–FIRST BANK: Have you ever obtained the written consent of P.C.A. before selling your crops?

"MR. ALDRICH: They've never asked me to. There's never been a question. They know before where my crops are going.

"COUNSEL FOR SEA–FIRST BANK: They know in the first place as a result of your budget, is that right?

"MR. ALDRICH: Yes, we talked it over at the beginning of the year. You see, that's where they're expecting you to get the funds to pay them off, from the sale of your crops.

"COUNSEL FOR SEA–FIRST BANK: And they keep in touch with you during the course of the growing season and know when you're going to sell your crop?

"MR. ALDRICH: It's a two–way arrangement. I frequently stop in through the course of the year and kind of stay in touch with them about how things are going and this sort of thing.

"COUNSEL FOR SEA–FIRST BANK: And they've never raised any question about getting their approval before selling the crops or anything of the sort?

"MR. ALDRICH: No.

"COUNSEL FOR SEA–FIRST BANK: Now is it correct, Mr. Drew, that the procedure at P.C.A. was you prepare a budget of your expected expenditures during the course of the growing season and your expected income after harvest and you take that into P.C.A. and as a result of that, they loan you the money, is that correct?

"MR. DREW: That's right.

"COUNSEL FOR SEA–FIRST BANK: It's disbursed to you during the course of the growing season as your budget indicates, is that right?

"MR. DREW: Well, it's disbursed as we need it; the budget doesn't always follow what actually happens.

"COUNSEL FOR SEA–FIRST BANK: This calls for you to make repayment out of proceeds of the sale of your crop, is that right?

"MR. DREW: That's right.

"COUNSEL FOR SEA–FIRST BANK: Assuming you get paid, that's what you do, is that correct?

"MR. DREW: Yes.

The *Baker* PCA case, relied upon by the trial court, found a conditional consent on significantly different facts. In that case, the buyer was required to draw a draft making the *Baker* PCA (rather than the seller) the payee. Furthermore, the condition was that payment had to be received before the farm products were delivered to the buyer. Clearly that situation is not present in the case before us. Had the Southwest Washington PCA required its debtors to receive payment before delivering the crops or demanded that the PCA be made a payee on any checks or drafts of the buyer, we would have sufficient evidence to support a finding of conditional consent. *See generally* Annot., 97 A.L.R. 646 (1935). That not being the case, we hold that

"Counsel for Sea–First Bank: Did you borrow money from P.C.A. again this year?

"Mr. Goeres: Yes.

"Counsel for Sea–First Bank: That was in January or thereabouts?

"Mr. Goeres: Yes.

"Counsel for Sea–First Bank: By that time, Symons was already late on the one payment, is that right?

"Mr. Goeres: That's right.

"Counsel for Sea–First Bank: Did you discuss this matter with the P.C.A.?

"Mr. Goeres: Yes.

"Counsel for Sea–First Bank: What was the upshot of your discussion?

"Mr. Goeres: I still owe them, I'll just put it that way . . .

". . .

"Counsel for PCA: . . . the collateral is not limited to crops is it?

"Mr. Goeres: No. If I sell a piece of that equipment, I have to turn in the money to them or get their permission to trade it in on another piece which they probably would finance or something like that. In other words, I don't sell anything off of there unless they know it.

"Counsel for Sea–First Bank: But at any rate, they always know when your harvest time is, do they?

"Mr. Goeres: Well, they know when pea season is here, yes. The exact date it goes, no, of course not. They don't pay too much attention to that but they know there is a crop down there for Symons.

"Counsel for Sea–First Bank: But in terms of that specific clause, am I correct you never noticed it before or at least, never considered it might apply to your crop in terms of requiring written permission to sell?

"Mr. Goeres: No, because if P.C.A. had wanted a written permission, they would have said, "Here, we'll give you written permission." They don't really, they know I'm growing the peas and it's understood that the peas will go to the packing plant in the manner that they have to go . . ."

PCA unconditionally authorized and consented to the sale of the crops and waived its security agreement.

While our decision favors the buyer, Symons, and its creditor, Sea–First Bank, we do not think that it will disrupt farm financing or emasculate the protection afforded the PCA in RCW 62A.9–307(1). As we stated above, the PCA may preserve its security interest by placing definite conditions on its consent to sale. In addition, the farmer–seller, on his own initiative or at the PCA's insistence, could take a purchase money security interest when he sells his crops on credit. *See* RCW 62A.9–107; RCW 62A.9–312(3).

Because of our disposition of the case, appellant's other assignments of error need not be discussed. The judgment in favor of the PCA will be reversed.

REED, A.C.J., and PETRIE, J., concur.

Reconsideration denied April 4, 1978.

Review granted by Supreme Court September 22, 1978.