In re COAST TRADING COMPANY, INC., Debtor.

NORTHWEST LIVESTOCK PRODUCTION CREDIT ASSOCIATION, Plaintiff,

v.

COAST TRADING COMPANY, INC., the Oregon Bank, and the Bank of Nova Scotia, Defendants.

Bankruptcy No. 382–00974.
Adv. No. 82–0708.

United States Bankruptcy Court, D. Oregon.

June 10, 1983.

Leon Simson, Portland, Or., for trustee.

James Ray Streinz, Portland, Or., for plaintiff.

Richard Canaday, Portland, Or., for Bank of Nova Scotia.

Howard Levine, Portland, Or., for Oregon Bank.

## FINDINGS AND CONCLUSIONS

FOLGER JOHNSON, Bankruptcy Judge.

In the adversary proceeding of *Northwest Livestock Production Credit Association v. Coast Trading Co., The Oregon Bank, and The Bank of Nova Scotia,* No. 82–0708, the Court makes the following findings and conclusions:

There is no dispute as to the facts which have been stipulated in the pretrial order. In brief, L2 obtained a nonrevolving line of credit from plaintiff on November 25, 1981, in the amount of $1,451,005.00 and granted plaintiff a security interest in crops, livestock, equipment and goods and products and proceeds thereof. The printed form restricted the borrower from encumbering the assets to anyone else and from permitting sale or removal of the security without the written consent of plaintiff.

L2 sold and delivered to Coast at Burbank, Washington, on March 3 and 4, 1982, some 5,000 bushels of white wheat. L2 did not obtain plaintiff's written consent to the sale, but it had been the custom of the parties over years of dealing not to observe this requirement before sale.

Coast sent L2 a check for $18,501.00 in payment. L2 delivered the check to plaintiff, and it was presented for payment on April 8. The bank refused to honor it as Coast had filed its Chapter 11 on April 7. Plaintiff returned the check to L2 and Coast has not paid for the wheat otherwise.

Coast sold wheat to Bunge in Oregon which included the comingled wheat received from L2 and received $361,800.00 from Bunge on March 22. This was placed in Coast's regular bank account in the U.S. National Bank of Oregon. All of this money was spent by Coast before the end of March. Bunge did not pay the balance of $51,056.16 owed Coast for the wheat until June 10.

It was agreed in the pretrial order that L2 was never in default on the loan from plaintiff, nor did it fail to perform any covenant in the security agreement.

Plaintiff renewed L2's line of credit November 24, 1982, and returned the 1981

promissory note. L2 has been similarly financed for 18 years, with any unpaid balance from one year being included in the next year's promissory note.

Plaintiff seeks reclamation of the wheat or its proceeds and claims conversion by the two banks as Coast has turned over substantial receipts from accounts receivable to the banks—primarily The Oregon Bank, which had also seized money in Coast's bank account under its right of set off about the time of the filing of the Chapter 11. The wheat is now gone, and the claim is against the proceeds only.

By agreement of the parties, the court has not considered any question of marshaling nor of the right to the assets between the two banks and Coast's trustee.

The wheat is a crop and the crop is a farm product and L2 was engaged in farming operations. The sale to Coast in Washington was therefore an exception to the rule that a buyer in the ordinary couse of business takes free of a security interest created by the seller whether or not he knows of its existence. UCC 9–301(1). If plaintiff has not lost its right to follow the wheat into Coast's hands, its security interest continues also in identifiable proceeds.

The $361,800.00 paid by Bunge on March 22 and placed in Coast's bank account was completely spent, and Coast had overdrawn its account by March 30. Coast then borrowed one million dollars from The Oregon Bank. What was left of this was seized by the bank on April 5 when the bank felt its position was insecure. The court does not accept plaintiff's trust theory to give it a replacement interest in the funds borrowed from the bank, and holds that no identifiable proceeds from the Bunge payment remained at the time of the Chapter 11 filing either in the hands of Coast or the bank.

Bunge did not make the final payment of $51,056.16 for the wheat until June 10, 1982, and Coast's bank account has never been below $20,000.00 since then. Since the total sale to Bunge was over $412,000.00, it is obvious that the L2 wheat was a very small part of such sale. Other growers, the banks, and the trustee also have a claim to the proceeds, and if plaintiff has not lost its security interest, it should be valid only as to that portion of the proceeds that the L2 wheat bears to the total sale. If the court finds in favor of plaintiff in following its security interest this far, the exact apportionment can be determined by stipulation of the parties.

Having recognized that the plaintiff's claim, at best, is limited to less than $5,000.00, let us now consider the arguments as to whether it should be allowed at all. There are several hurdles the plaintiff must clear.

Since there are other PCA cases awaiting the outcome of this one, the court believes it desirable to touch on several of the questions raised. L2 delivered the wheat in the state of Washington, and absent a waiver of certain provisions in the security agreement, the wheat was still subject to the security interest of plaintiff.

 Has plaintiff waived its security interest by permitting L2 to sell wheat without obtaining the prior written consent of plaintiff as provided in the security agreement? Plaintiff had been doing business with L2 for 18 years and never required L2 to obtain such consent before selling. It was understood that L2, upon receipt of the proceeds from the sale would turn over such payment to plaintiff, and L2 regularly did so. Their relationship was a very satisfactory one for both.

UCC 9–306(2) provides:

"Except where this Article otherwise provides, a security interest continues in collateral notwithstanding sale, exchange or other disposition thereof unless the disposition was authorized by the secured party in the security agreement *or otherwise,* and also continues in any identifiable proceeds including collections received by the debtor." [emphasis added.]

While disposition was not authorized by the security agreement, defendants assert that it was authorized by the course of conduct. Plaintiff claims that the sale was authorized only on condition that the proceeds therefrom be turned over to plaintiff

and hence there could be no waiver before receipt of payment. Coast did give L2 a check in payment which was turned over to plaintiff, but plaintiff failed to negotiate it in time to clear before Coast's Chapter 11, and plaintiff returned the dishonored check to L2. There had, therefore, been no payment for the wheat.

In the recent Ninth Circuit Bankruptcy Appellate Panel decision, March 15, 1983, of *Halperin v. Tri-State Livestock Credit Corp.,* 28 B.R. 13, arising out of Arizona in the *Ellsworth* Chapter 7, the facts were almost identical to our present case. The panel followed the Tenth Circuit decision in *First National Bank v. Iowa Beef Processors,* 626 F.2d 764 (10 Cir.1980), and held that Tri-State's security interest terminated when the cattle were transferred to Ellsworth with Tri-State's authorization even though it was conditioned on subsequent receipt of the proceeds by Tri-State. The court distinguished between conditions precedent to authorization and conditions subsequent. The latter, in essence, make the buyer an insurer of acts beyond its control. This reasoning has merit, and the Washington Court of Appeals reached the same result in *Southwest Washington Production Credit Ass'n v. Seattle First National Bank,* 19 Wash.App. 397, 577 P.2d 589 (1978). Such decision, however, was reversed by the Washington Supreme Court a year later, 92 Wash.2d 30, 593 P.2d 167, holding that the secured creditor did not lose its interest in crops by conditioning its assent to sale on such creditor's receipt of the proceeds. The Oregon case of *Baker Production Credit Ass'n v. Long Creek Meat Co., Inc.,* 513 P.2d 1129 (1973), takes a similar position.

This was a Washington sale to Coast, and even though it can be argued that those cases are distinguishable, the court believes the rulings to be broad enough to cover the Coast situation and therefore feels constrained to follow the law as interpreted by the Supreme Court of Washington and find that there was no waiver of plaintiff's security interest. Such interest, therefore, followed the wheat to Oregon and continued to remain superior to the general security interests of The Oregon Bank and The Bank of Nova Scotia on Coast's inventory and accounts receivable.

█ Plaintiff never perfected its security agreement in Oregon by filing a financing statement there. What effect did that have? Plaintiff had no right to follow the grain into the hands of Bunge. As far as Coast is concerned, only the payment received on June 10 is involved. This was less than four months after removal of the wheat to Oregon. It was stipulated that the balance in the bank account in which Coast deposited the last Bunge payment has never been less than $20,000.00 since then. To protect its interest in such cash proceeds was plaintiff still required to file a financing statement in Oregon after June 10 but before the end of the four months? The purpose of the four-month rule is to protect purchasers and new creditors acquiring an interest in the collateral without knowledge of the security interest in the other state and still give the first creditor reasonable opportunity to protect its security. It was not designed to provide a windfall for the debtor who removed the property subject to the security agreement, but the debtor-in-possession or trustee is a different party. To preserve its interest in the proceeds against the two banks which held valid, but up to then, inferior interests in such proceeds, and against the debtor-in-possession or trustee, filing in Oregon was necessary within the four-month period. When plaintiff failed to do so, its lien was lost. It is possible that had plaintiff filed suit in the bankruptcy court within the four-months to recover the proceeds, it might have been sufficient to preserve its lien as to those defendants named in the suit. But the court does not have to decide this as no complaint was filed until September 23.

A request has been made that any judgment in this proceeding be signed by a district judge since this falls within the category of "related" proceedings in which the jurisdiction of the Bankruptcy Court was struck down by the U.S. Supreme Court in the renowned *Marathon Oil* case.

**674**

Should review of the bankruptcy judge's findings by a district judge also be requested, and should such judge reverse those findings that are adverse to plaintiff, then that portion of the Bunge June 10 payment which is allocable to the L2 wheat would be traceable into Coast's present bank account under the lowest intermediate balance rule. Plaintiff would be entitled to recover that sum from Coast as a secured creditor. Since none of that money would be deemed to have gone to the two banks, plaintiff's case for conversion against the banks would fail, and the complaint should be dismissed as to the banks.

■ In the event that the district court in a "review de novo" should find for plaintiff on all questions previously discussed, an additional point should be considered. Defendants claim that plaintiff lacks standing to sue them. They argue that this is basically a reclamation, replevin, or conversion case, and plaintiff must have the right to immediate possession of the security to bring such suit. Under the security agreement between plaintiff and L2, plaintiff would be entitled to the security only if L2 could be deemed in default under paragraph (9) of such agreement. There was no such default. In the pretrial order it was stipulated that L2 had never been in default and had never failed to perform any covenant in the security agreement. L2 might well have preferred that plaintiff bring suit against Coast rather than do so itself, but having failed to reclaim the grain within 10 days after sale, L2 had only an unsecured claim and assignment of this to plaintiff could carry no right to claim the grain. L2 may have chosen to make payments from other sources to keep the loan current. Plaintiff did not feel itself insecure and made no attempt to declare a default or accelerate the loan.

The court therefore finds that plaintiff does not have standing to bring this suit and has no direct cause of action against defendants. The complaint should therefore be dismissed.