619 P.2d 551

Grace BEGAY, Lydia Reeves, Plaintiffs–Appellees,

v.

FOUTZ & TANNER, INC., d/b/a Tanner's Big Dollar, Defendant–Appellant.

Nos. 3804, 3805.

Court of Appeals of New Mexico.

Oct. 23, 1979.

Rehearing Denied Nov. 6, 1979.

Writ of Certiorari Granted Dec. 14, 1979.

Judy A. Flynn–O'Brien, Earl R. Mettler, Timothy V. Flynn–O'Brien, Shiprock, for plaintiffs–appellees.

John E. Schindler, Palmer & Frost, Farmington, for defendant–appellant.

## OPINION

WALTERS, Judge.

Plaintiffs Begay and Reeves are Indians who frequently pawned Indian jewelry articles with defendant trading company. Both complained, in separate suits below, that when they defaulted in payment of the loans collateralized by their pawned jewelry, defendant attempted to retain the collateral pursuant to § 505 of the Uniform Commercial Code (§ 55–9–505, N.M.S.A. 1978), instead of proceeding properly under § 504 which requires notice of intention to sell and delivery of any surplus to the debtor. The jewelry was sold ultimately by defendants as "dead pawn" to a related corporation dealing in the retail and whole-

sale business of Indian jewelry. Plaintiff Reeves claimed in addition that she had not received the postcard notice sent by defendant of its intention to retain possession in discharge of her debt. The suits were consolidated for appeal.

In both cases (non–jury trial in one case being followed the next day by trial of the other) the court decided the issues in favor of plaintiffs.

## I

We will discuss the *Begay* case first because defendant's method of asserting its creditor's right upon default was the same in both cases and, forgoing for the moment the issue of notice raised in *Reeves*, our resolution of the rights of the plaintiffs and the remedies available to defendant will apply to both cases.

The trial court found that plaintiff Begay was uneducated, did not speak English, and had a limited understanding of commercial and legal matters (Finding 9). It made the further findings that:

11. Tanner's Big Dollar is a retail outlet which sells groceries and other merchandise, including Indian jewelry and other Indian goods, and which has a substantial pawn business.

12. That plaintiff, for many years prior to and during 1974, borrowed money from defendant's pawn department, usually three or four times per month, using her Indian jewelry as collateral.

13. That plaintiff was a regular pawn loan customer of defendant and was known personally by the manager of defendant's pawn department, who regarded her as a special customer and had loaned on her pawn approximately fifteen years.

. . . . .

15. That the value of the jewelry pawned by plaintiff in these transactions was several times greater than the amount loaned by defendant, which amount was $200.00 in each transaction.

16. That plaintiff did not repay the loans made by defendant.

17. That on or about November 26, 1974, defendant sent plaintiff a notice of intent to retain the collateral with respect to each transaction, on a form regularly used by defendant for that purpose, a copy of which was admitted into evidence as Defendant's Exhibit 1.

18. That in other transactions, defendant had previously kept plaintiff's pawned jewelry after default until plaintiff was able to pay back the amount loaned.

19. That the course of prior dealings between the parties led plaintiff to expect that defendant would retain her jewelry for her until she could redeem it.

20. That defendant moved plaintiff's jewelry into defendant's sale inventory upon plaintiff's default and a short time thereafter sold the jewelry.

21. That in accordance with its normal business practice, defendant sold the jewelry to Joe E. Tanner, president and a director of Foutz & Tanner, Inc., or to Joe E. Tanner, Inc., a corporation owned and operated by Joe E. Tanner and engaged in the retail and wholesale of Indian jewelry.

22. That defendant did not maintain records sufficient to identify the date on which the sale of a particular piece of pawn took place or for how much it was sold.

23. That Joe Tanner decided how much he would pay defendant for dead pawn by estimating the new replacement cost of a piece of jewelry and by delivering to defendant an amount equal to this cost figure plus 10 percent.

24. That Joe Tanner, on behalf of himself or of Joe E. Tanner, Inc., customarily resold dead pawn from Tanner's Big Dollar to individuals or

to other retail or wholesale establishments including retail outlets in Scottsdale, Arizona, and LaJolla, California, owned by Joe Tanner.

. . . . .

28. That the defendant, or its employees, including Robert Tanner, determined the amount of money that it would loan on a particular piece of Indian jewelry, and as a general rule loaned substantially less than what it determined to be the value of the jewelry, so that there would be virtually no chance of loss to defendant in the event of a default.

29. That in the instant case, the value of the jewelry pawned was several times greater than the amount of money borrowed from defendant.

30. That defendant never returned surplus proceeds from sales of dead pawn to the pawn debtors and did not return any surplus from the sale of the jewelry in question to plaintiff.

31. That defendant did not act in good faith in purporting to retain plaintiff's jewelry instead of acknowledging that it sold the jewelry and accounting to her for any surplus received after satisfaction of her debt.

32. That the notice of intent to retain used by defendant stated that the debtor had thirty days from the date of preparation of said notice in which to object to the retention, rather than thirty days from receipt of the notice.

33. That the notice of intent to retain that was sent by defendant did not inform plaintiff that defendant would sell her jewelry in satisfaction of her debt.

34. That the notice of intent to retain sent by defendant did not inform plaintiff that she could require defendant to sell the jewelry and pay her any surplus received.

. . . . .

36. That defendant's conduct in claiming to have retained collateral while in fact selling it and in selling dead pawn to a stockholder and director of a related corporation always resulted in a complete loss of the debtor's substantial equity in the collateral.

37. That the conduct of defendant in selling the collateral to a stockholder or related corporation in such a way as to result in a complete loss of the debtor's substantial equity was not commercially reasonable.

38. That defendant's conduct was not in good faith, considering the relative bargaining power of the parties.

The court concluded that § 55–9–504 applied to defendant's sale of the collateral; that the section was violated because notice of sale was not given, the jewelry was not sold in a commercially reasonable manner and that "the surplus of such a sale" was not returned to Mrs. Begay; that defendant's failure to act in good faith violated § 55–1–203; that the form of notice of retention was in violation of § 55–9–505 because it gave the debtor only thirty days from preparing the notice (rather than from its receipt) within which to object to retention; and that plaintiff was entitled to damages of $2060 plus interest from November 1, 1974.[1]

Appellant does not attack the court's findings; it argues, in essence, that the law under the Commercial Code, regardless of the facts found, was ignored. Notices of default and intention to retain the collateral pawned on July 6th and July 23rd, 1974 were mailed to Mrs. Begay on November 20th and 25th, 1974, respectively; and she received the notices. She and her sister inquired of defendant about the pawned jewelry for the first time in February 1975, to find that the articles no longer were in defendant's possession. At that time, her obligations to repay were approximately six months overdue and her right to object to

1. The significance of this date is not apparent.

retention, under § 55–9–505, had expired by almost two months. There was no evidence to show when the "dead pawn" was sold to, or the amount paid to defendant by, the other Tanner corporation. Consequently there was no evidence whether the sale by defendant was "a short time" (Finding No. 20) or a long time after default–nor, indeed, any standard of measurement of either a "short" or "long" time.

The gist of plaintiff's suit was that although defendant gave notice of its intention to retain the pawn, and did retain it for some period after the time for objection had run, the fact of later sale conclusively established a concealed intention to sell. If defendant intended to sell, she urged, it must follow the public or private sale requirements of § 55–9–504.

We think that both counsel for plaintiff and the trial court misunderstood Part 5 of Article 9 of the Uniform Commercial Code. Counsel suggested, when asked at oral argument, that the creditor's option of retention under § 55–9–505(2) is not available to pawnbrokers dealing in Indian pawn because, in the context of the disparity in value of the pawn and the amount loaned, the customary ignorance of the borrowers in commerce and law, and the pawnbroker's usual practice of subsequently selling dead pawn, there could never be a true intention to retain the collateral.

■ We observe, first, that the Code places no limitations on the kind of secured party–creditor who may exercise the options provided in Part 5. Section 55–9–501, NMSA 1978. Secondly, an election to retain under § 55–9–505(2) is a complete

satisfaction of the debt, and where the collateral is other than consumer goods, the debtor is relieved of any deficiency that might arise if the secured party had, instead, proceeded under § 55–9–504. Third, when the secured party gives notice of his intention to retain, the debtor has the right to object to retention and then the secured party *must* dispose of it under § 55–9–504.[2] Section 55–9–505(2) expressly provides that if the debtor *fails* to make written objection "the secured party may retain the collateral in satisfaction of the debtor's obligation."

We are not free to write provisions into the statute. We are required, instead, to assume that the Legislature acted advisedly in establishing the law unless and until the contrary clearly appears. *State v. La Badie*, 87 N.M. 391, 534 P.2d 483 (Ct.App.1975). We cannot, then, hold that the remedies of § 55–9–505(2) are accessible to all secured parties except pawnbrokers dealing in Indian pawn with Indian debtors. They too, as secured parties described by § 55–9–105(1)(i), NMSA 1978, may avail themselves of the remedies provided by the Code.

Holding as we do that defendant was entitled to assert retention under § 55–9–505(2), we next consider whether the trial court properly directed its attention to the equitable matters reflected by its Findings 9, 12, 13, 15, 18, 19, 28, 29, 36, 37, and 38;[3] and whether because the pawn was later sold after it had been classified as "dead pawn,"[4] the court was authorized to conclude that the sale subsequent to notice of retention had to be conducted according to § 55–9–504.

**2.** Footnote 134 at 1–B Bender's Uniform Com. Code Service, ¶ 20.05[3][d], expresses the protection to the debtor envisaged by the codifiers: "By lodging the choice [of resale or retention] in the buyer, he is given the power of exercising judgment as to the most profitable approach: resale with liability for a deficiency or no resale with no such liability."

This power in the debtor was analyzed, in *Kruse, Kruse & Miklosko v. Beedy*, 353 N.E.2d 514, 537 (Ind.App.1976), as a procedure incorporated within the U.C.C. to "present a debtor in default with an element of choice in the matter, *thereby supplanting the need for tradi-*

*tional equitable considerations.*" (Our emphasis.)

**3.** With respect to Finding 9, the evidence from plaintiff as well as from defendant's agent was that Mrs. Begay and Mr. Tanner always spoke Navajo during their numerous pawn transactions, and she understood when and how her collateral would become "dead pawn."

**4.** There is no support in any testimony that plaintiff's jewelry was moved "into defendant's inventory *upon default*" or that "a short time thereafter [it was] sold." (Finding 20.)

■ Disposing first of Findings 32, 33 and 34 quoted above, we note that the statute does not require defendant to do any more than give written notice to plaintiff that it intends to "retain the collateral in satisfaction of the obligation." Section 55–9–505(2). The burden then shifts to the obligor to assert within thirty days after receiving notice her demand for disposal by resale. The secured party has no duty to advise its debtor of that right, or how or when it must be made. The inaccuracy of the black–letter statement in the notice that plaintiff could "object to my retention within 30 days of mailing of this notice" was of no consequence, for two reasons: (1) defendant was under no obligation to advise Mrs. Begay that she could object, and (2) Mrs. Begay took no action, much less made any objection, until almost three months after the notice was delivered to her. She was not prejudiced by the incorrect time limit stated in the notice.

Concerning the matters of equity found by the court regarding the course of prior dealings, plaintiff's reliance thereon, disparity of values, lack of good faith, relative bargaining power of the parties, etc., we take especial note that it is not plaintiff's claim that the pawn contract was unconscionable at the time it was made, which would have permitted the trial court to refuse enforcement of the contract under § 55–2–302. *Hernandez v. S.I.C. Fin. Co.*, 79 N.M. 763, 448 P.2d 474 (1968); *cf. Williams v. Walker–Thomas Furniture Co.*, 350 F.2d 445 (D.C.Cir.1965). These findings were directed toward unconscionability (or absence of "good faith") in defendant's election of the remedies available to him, under the Code, after default–in reality, they were supplements to a tacit finding that defendant harbored an intention to sell the dead pawn sometime in the future if plaintiff did not object to the remedy chosen and force an immediate sale. Although not articulated, it is obvious that the court determined the act of subsequent resale to have tainted and replaced defendant's stated intention at the time notice was sent to plaintiff to retain the collateral in satisfaction of the debt, to an intention to sell.

Mrs. Begay contends that the court's right to so view this matter has found approval in other cases. She cites us to *National Equipment Rental, Ltd. v. Priority Electronics Corp.*, 435 F.Supp. 236 (E.D.N.Y.1977); *Moran v. Holman*, 514 P.2d 817 (Alaska 1973); *In re Sports Autos, Inc.*, 6 U.C.C. Reporting Service 991 (Pa.1969), and others.

■ All of the cases referred to us considered whether (1) the creditor, by his conduct, had elected retention and therefore could not seek a judgment for deficiency, or (2) the notice provisions of either § 504 or § 505 had been followed with respect to a sale and suit for deficiency or to a valid retention. We are not faced with a situation of that kind. Here, the secured party elected to retain, notified the debtor of that election, and after an apparent acquiescence by the debtor to the manner selected by defendant in which her obligations would be extinguished, the secured party treated the collateral as its own (which it was) and disposed of it as it chose. When a creditor retains the collateral in discharge of the debt, he becomes its owner. *Farmers State Bank v. Otten*, 87 S.D. 161, 204 N.W.2d 178, 180 (1973).

Justice Moise pointed out, in *Hernandez, supra*, that unconscionability is a provision of the Code is "applicable to sales, and by its terms does not apply to security transactions." 79 N.M. at 675, 448 P.2d 474. The claim was made in *Hernandez* that the debtors should be forgiven for default because they were uneducated in English, had lived in this country only seven years, and had not had the agreement explained in their native language. The court refused to find, under those facts, that the transaction was "so grossly unfair" it should not be enforced. We see no difference in the similar facts of this case. The transaction itself was not unconscionable.

None of the cases relied on by appellee or found in our exhaustive research impose a restriction forbidding the creditor who has retained under § 505 from later disposing of the property by sale or otherwise. Nor does

the Code require the property to be retained forever. Indeed, such a qualification upon the right to retain after compliance with the notice conditions of § 505(2) might well be an unconstitutional invasion of one's right to contract, *Standard Oil Co. v. United States*, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911); or to dispose freely of his property in any lawful manner. *Pfeifer v. Albeidinger*, 166 Neb. 464, 89 N.W.2d 568 (1958).

█ Our concern, then, is not whether the ultimate sale was commercially reasonable [5] because we never reach that question if defendant took the proper steps to erase the debt after plaintiff's default, by retaining the goods. Our scrutiny is limited to the manner in which the remedy under § 55–9–505(2) was invoked and pursued *at the time* defendant made its election. Under this inquiry we are unable to discover that defendant did anything less than he was required to do. We find no evidence that the collateral was resold before the time ran for plaintiff to object. Defendant testified it was sold after it had been classified as "dead pawn," and that classification was never attached by defendant until at least thirty days had passed after notice was given. The exhibits introduced at trial show that items pawned by others usually were transferred as "dead pawn" sometime between two and nine months after the notice to retain had been mailed to the debtor. Defendant complied with the statutory requirements for retaining the collateral, so it did not act in bad faith in that respect.

Does disparity in the value of the collateral and the amount loaned create a circumstance of bad faith in its retention? *Cerasoli v. Schneider*, 311 A.2d 880 (Del.Super. 1973), considering such a claim, held:

The statutory provision [9–505(2)] which permits retention of collateral in satisfaction of a debt *places no limitation on the value of the collateral retained.* Presumably a creditor could lawfully retain collateral having a value substantially greater than the amount of the debt and lawful interest satisfied without running afoul of the usury statute. *The safeguard in such case is the right of the debtor to object and thereby require sale of the collateral.* [Our emphasis.]

We agree with Delaware's analysis. Moreover, the protection to the debtor equalizes any initial inequality in bargaining power, and removes the necessity for a debtor to rely upon any prior course of dealings.[6] Mrs. Begay had the authority to direct the manner in which satisfaction of her obligation be handled and having failed to exert it, it is unfair in an after–the–fact evaluation to place the onus of her ignorance or lethargy upon a business establishment which observed the letter of the law, and then some, in its dealings with her.

There is no bad faith when a secured party has acted with honesty in fact. Section 55–1–201(19), N.M.S.A. 1978.

The trial court erred in determining that defendant had to proceed under § 55–9–504. Defendant followed the steps required under the remedy it selected, and plaintiff acquiesced. What defendant did with the goods later is irrelevant; plaintiff's obligation to defendant and her interest in the goods had been cancelled at that time. Nor may evidentiary findings relating to conduct or events subsequent to defendant's exercise of a lawful remedy serve to convert a § 505(2) election to an election under § 504.

**5.** "The comment to § 9–503 states that § 9–504(3) requires that every action by the secured party in connection with a *disposition* must be taken in a reasonably commercial manner. One might otherwise argue, however, that repossession [or retention] is separate from disposition and thus outside of the Code rules requiring disposition to be 'commercially reasonable.'" 1A Bender's Uniform Com. Code Services 939, fn. 87.

**6.** See the comment of the *Miklosko* court, supra, note 1. *See also* § 1–205(4) providing that a written agreement inconsistent with the parties' course of dealing controls; and *Southwest Washington Prod. Credit Assn. v. Seattle–First National Bank*, 19 Wash.App. 397, 577 P.2d 589 (1978), holding that a prior course of dealing without more is insufficient to waive a written security agreement.

We hold, therefore, that the trial court's findings are largely–indeed, almost totally–immaterial. They cannot alter or limit the remedies legally available to a secured creditor.

Defendant was entitled to a dismissal of the complaint against him. The judgment in *Begay* is reversed and remanded for such disposition.

## II

The facts of *Reeves* parallel those in *Begay*. Mrs. Reeves pawned some turquoise beads with defendant on March 30, 1974. No payments were made, and on July 8, 1974 a notice of intention to retain the collateral was mailed to plaintiff Reeves at the post office box address given by her when she pawned the goods. However, she had moved in June or July without notifying defendant, and the post office box was relinquished on July 17th. She thought her husband had filed a change of address form with the post office; and her husband wasn't sure whether he or plaintiff did. In any event, she never received the notice mailed by defendant. There was evidence that the post office forwarded postcards if it had a forwarding address, but if they were undeliverable they were not returned to the sender.

The court's findings were virtually identical to those in *Begay*, and included a finding that Mrs. Reeves did not receive a postcard or notice concerning her March 30th transaction.

Plaintiff argues that she did not have the opportunity to require sale under § 504 because she was unaware of defendant's intention to retain. The jewelry was classified as "dead pawn" on August 21st, and ultimately resold to Joe E. Tanner, Inc., just as in *Begay*. Mrs. Reeves believed she sought to redeem the article in early September. These facts present us with reconciling what appears to be a "notice" inconsistency within § 505(2) itself, and the definition of "notice" found in § 1–201.

Section 505(2) requires that "[w]ritten notice of such proposal [to retain] shall be *sent* to the debtor . . . ." "Send" is defined at 55–1–201(38), N.M.S.A. 1978:

"Send" in connection with any writing or notice means to deposit in the mail or deliver for transmission by any other usual means of communications with postage or cost of transmission provided for and properly addressed and in the case of an instrument to an address specified thereon or otherwise agreed, or if there be none, to any address reasonable under the circumstances. The receipt of any writing or notice within the time at which it would have arrived if properly sent has the effect of a proper sending.

It is not disputed that the notice was *sent*; the court found that plaintiff did not receive it.

Section 1–201 provides:

A person "notifies" or "gives" a notice or notification to another by taking such steps as may be reasonably required to inform the other in ordinary course whether or not such other actually comes to know of it. A person "receives" a notice or notification when:

(a) it comes to his attention; or

(b) it is duly delivered at the place of business through which the contract was made or any other place held out by him as the place for receipt of such communications.

Section 505(2) continues:

If the debtor . . . objects in writing within thirty days *from the receipt* of the notification . . . the secured party must dispose of the collateral under Section 9–504. *In the absence of such written objection the secured party may retain the collateral* in satisfaction of the debtor's obligation. (Our emphasis.)

There was evidence that the notice was deposited in the mail as required; there is no evidence whether it was delivered or not at the place held out by plaintiff as the place for receipt of such communications, the post office box. It has been held, in construing the requirements of notification to be sent a debtor under § 504(3), that the test of notification is not whether the debtor receives the notice but only whether the

secured party has made a good faith effort and took such steps as a reasonable person would have taken to give notice. *Hall v. Owen Co. State Bank*, 370 N.E.2d 918, 925 (Ind.App.1978); *James Talcott, Inc. v. Reynolds*, 165 Mont. 404, 529 P.2d 352, 355 (1974). We see no reason why the rule should be different under § 505(2) when retention (without actual notice because of nondelivery) results in no liability to the debtor for any deficiency, as opposed to the imposition of such liability if a sale is made under § 504(3) and the debtor has, under similar circumstance, not received notice of the proposed sale.

Defendant complied with the requirements of "sending notice." No reason was given, other than the possibility that plaintiff moved some time between the date the notice was mailed and the date the post office box was surrendered, to explain why she did not receive the notice.

In view of the lengthy delinquency in repayment of the loan, defendant's adherence to the only notice requirements he was bound to observe, and the lapse of at least another thirty days of silence from plaintiff, we hold that the notice provisions of § 55-9-505(2), were fulfilled and that defendant was free to deal with the property, after the statutory period of retention had expired, in any manner he wished.

All other questions relating to the court's evidentiary findings and resulting conclusions are answered in our discussion relating to *Begay*, above. Plaintiffs are as bound by the provisions of the Uniform Commercial Code, and its rights and liabilities, as are all other New Mexico residents engaging in commercial transactions, and a creditor may not be deprived of his statutory remedy simply because he deals with unsophisticated debtors. It was long ago said: "Ignorance of the law excuses no man; not that all men know the law, but because 'tis an excuse every man will plead, and no man can tell how to confute it." [7] The Code provisions are reasonable; the Legislature included within them safeguards for both parties. It is neither rea-

sonable nor discerning to expect the courts to expand the rights of one party beyond the allowances of the Code at the expense of and to the deprivation of the other. Courts do not create exceptions where the statute contains none. *Natseway v. Jojola*, 56 N.M. 793, 798, 251 P.2d 274 (1952). Defendant was entitled to judgment in its favor.

The judgment in *Reeves* is reversed, and the case remanded for entry of judgment in favor of defendant.

IT IS SO ORDERED.

LOPEZ, J., concurs.

SUTIN, J., dissents.

SUTIN, Judge (dissenting).

I dissent.

In *Begay*, the trial court made 39 findings of fact. The defendant challenged none.

### A. Facts and conclusions in Begay.

Begay is a Navajo Indian, an uneducated person who does not speak English and whose understanding of commercial and legal matters is extremely limited. Defendant is a retail outlet that sells groceries and other merchandise, including Indian jewelry and other Indian goods, and which has a substantial pawn business.

On July 6, and July 24, 1974, Begay left several items of jewelry with defendant as collateral for a thirty day loan of $200.00 identified by pawn ticket # 1582 and # 2066. Begay did not repay these loans. On November 26, 1974, defendant sent notice to Begay proposing to retain the collateral in satisfaction of the two debts, which notices Begay received. Defendant's notice of intent to retain stated that the debtor had 30 days from the date of preparation of the notice in which to object to the retention, rather than 30 days from receipt of the notice. This notice did not inform Begay that defendant would sell her jewelry in satisfaction of the debt or that she could

---

7. John Selden, Table Talk: Law (1689)

require defendant to sell the jewelry and pay her any surplus received. Defendant never sent notice of intent to sell to pawn debtors and did not send such notice to Begay.

For many years prior to and during 1974, Begay borrowed money from defendant's pawn department, usually three or four times per month, using her Indian jewelry as collateral. She was a regular pawn loan customer of defendant and was known personally by the manager, one who regarded her as a special customer and who had loaned on her pawn for approximately 15 years. In other transactions, defendant had previously kept plaintiff's pawned jewelry after default until Begay was able to pay back the amount loaned and the course of private dealings led Begay to expect that defendant would retain her jewelry for her until she could redeem it. But defendant moved her jewelry into defendant's sale inventory upon Begay's default and a short time thereafter sold the jewelry in accordance with its normal business practice to Joe E. Tanner, president and director of defendant or to Joe E. Tanner, Inc., engaged in the retail and wholesale sale of Indian jewelry.

Defendant determined the amount of money that it would loan and as a general rule loaned substantially less that what it determined to be the value of the jewelry so that there would be virtually no chance of loss to defendant in event of a default.

Defendant did not maintain records sufficient to identify the date on which the sale of a particular piece of pawn took place or for how much it was sold. The value of the jewelry pawned by Begay was several times greater than the amount loaned by defendant. But Joe Tanner decided how much he would pay defendant for dead pawn by estimating the new replacement cost of a piece of jewelry and by delivering to defendant an amount equal to this cost figure plus 10%. Tanner customarily resold dead pawn received from defendant to individuals or to other retail or wholesale establishments, including retail outlets owned by Tanner in Scottsdale, Arizona and LaJolla, California.

In the Indian jewelry business, the price paid by a "jobber" for jewelry is 120% of cost, the wholesale price is 150% of cost, and the retail price is 300% of cost. Tanner offered dead pawn jewelry for sale at defendant's place of business at the above markups.

Defendant never returned surplus proceeds from sales to dead pawn to the pawn debtors and did not return any surplus from the sale of the jewelry in question to Begay. Defendant did not act in good faith in purporting to retain Begay's jewelry and in making an accounting to her for any surplus received after satisfaction of her debt.

Defendant's conduct in selling, which resulted in a complete loss of the debtor's substantial equity, was not commercially reasonable, was not in good faith, considering the relative bargaining power of the parties.

The trial court concluded that the pawn transactions were governed by the New Mexico Commercial Code; that § 55-9-504, N.M.S.A. 1978 applied to defendant's sale of the collateral (*challenged*); that defendant sold jewelry without sending notice of sale, without selling in a commercially reasonable manner and without returning the surplus of such a sale to Begay, all in violation of § 55-9-504; that defendant's failure to act in good faith in the transactions violated § 55-1-203 (*challenged*); that the form of notice of intention to retain used by defendant violated § 55-9-505 by giving the debtor only thirty days from preparation of the notice in which to object to retention; and that Begay was entitled to damages in the amount of $2060 plus interest at the rate of 6% from November 1, 1974, pursuant to § 55-9-507 (*challenged*).

Defendant challenged the three conclusions noted.

### B. *Unchallenged findings are binding on appellate court.*

Under Rule 9(m) of the Rules of Appellate Procedure in Civil Cases, "If any finding is challenged, it *must* be so indicated by

a parenthetical note referring to the appropriate numbered point in the argument ...." [Emphasis added.] This requirement is mandatory. The mere challenge is not sufficient to raise an issue on appeal. Reference must be made to the appropriate numbered point in the argument so that an appellant can state the precise ground or grounds for challenging findings and clearly point out the claimed error or errors in the findings on which he relied. *McLam v. McLam*, 85 N.M. 196, 510 P.2d 914 (1973). Where no challenge is made, the appellant is not entitled to a review of the evidence, and the findings are binding on the appellate court. *Citty v. Citty*, 86 N.M. 345, 524 P.2d 517 (1974). These findings will not be set aside regardless of whether the reviewing court agrees with the trial court. *Begay v. First National Bank of Farmington*, 84 N.M. 83, 499 P.2d 1005 (Ct.App.1972).

Requested findings contrary to unchallenged findings and conclusions cannot raise an issue on appeal. *Trujillo v. Tanuz*, 85 N.M. 35, 508 P.2d 1332 (Ct.App.1973).

The only issue on the Begay appeal is whether a conclusion of the trial court is supported by the findings. A judgment cannot be sustained on appeal unless the conclusion on which it rests finds support in one or more of the findings. *Watson Land Company v. Lucero*, 85 N.M. 776, 517 P.2d 1302 (1974).

C. *The conclusion of the trial court was supported by the findings.*

Defendant claims that the trial court erred in not applying § 55-9-505(2), N.M. S.A. 1978. The pertinent part of this section reads:

[A] secured party in possession may, after default, propose to retain the collateral in satisfaction of the obligation. Written notice of such proposal shall be sent to the debtor .... If the debtor ... entitled to receive the notification objects in writing within thirty days from the receipt of the notification ... the secured party must dispose of the collateral under Section 9-504 [55-9-504, NMSA 1978]. In the absence of such written objection

the secured party *may* retain the collateral in satisfaction of the debtor's obligation. [Emphasis added.]

By use of the word "may," this section means that absent a written objection, it was permissible for defendant to retain the jewelry in satisfaction of Begay's obligation. Section 12-2-2(I), N.M.S.A. 1978. *McCullough v. Mobiland, Inc.*, 139 Ga.App. 260, 228 S.E.2d 146 (1976). Section 9-505(2) is a permissive, not a mandatory remedy. It is a provision drafted for the benefit of the secured party by allowing him the option to retain collateral in satisfaction of the debt in certain specified situations and where he manifests that intent. *Jones v. Morgan*, 58 Mich.App. 455, 228 N.W.2d 419 (1975). It does not direct that defendant must retain the jewelry in satisfaction of Begay's obligation. There is an alternative remedy. If defendant did not elect to retain the jewelry in satisfaction of the debt, defendant was compelled to dispose of the jewelry within a commercially reasonable time under § 9-504. Under this alternative, § 9-505(2) was inapplicable.

No finding was made by the court that defendant retained the jewelry in satisfaction of the debt. To the contrary, the court found "That *the course of prior dealings* between the parties led plaintiff to expect that defendant would retain her jewelry for her *until she could redeem it*; That defendant moved plaintiff's jewelry into defendant's sale inventory *upon plaintiff's default and a short time thereafter sold the jewelry.*" [Emphasis added.]

Section 55-1-205(1) reads:

A course of dealing is a sequence of previous conduct between the parties to a particular transaction *which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct.* [Emphasis added.]

For 15 years, defendant and Begay had a course of dealing in loans made upon pawns of jewelry in which defendant retained the collateral until Begay redeemed it. To now allow defendant to profit exorbitantly to the total loss of Begay is inequitable and

unfair. For a debtor's attempt to prohibit a deficiency judgment under the Commercial Code see, *Ruidoso State Bank v. Garcia*, 92 N.M. 288, 587 P.2d 435 (1978). The trial court did not err. Section 9–505(2) was not applicable.

The trial court properly concluded that § 9–504 applied. Defendant did not challenge the court's conclusion that defendant violated this section of law.

Defendant also challenged the court's conclusion that defendant failed to act in good faith. This conclusion was supported by the findings of fact. Section 55–1–203 imposes an obligation of good faith upon the parties as a duty in the performance or enforcement of every contract. " '[G]ood faith' means honesty in fact in the conduct or transaction concerned." Section 55–1–201(19). " '[G]ood faith' in the case of a merchant means honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade." Section 55–2–103(1)(b).

For a scholarly report on the meaning of "good faith" see, Holmes, *A Contextual Study Of Commercial Good Faith: Good–Faith Disclosure In Contract Formation*, 39 U.Pitts.L.Rev. 381 (1978). We must recognize the difficulty involved in understanding the essential elements necessary, from an objective point of view, to constitute good faith. In viewing the evidence, a trial judge arrives at findings of fact, based upon personal convictions, from the type of conduct exercised which smacks of bad faith.

On review, being far removed from the courtroom, our duty is to accept the findings of the trial court unless the mere review of the transcript shocks the conscience.

The trial court properly concluded that § 9–504 applied to defendant's sale of the collateral and that defendant's failure to act in good faith in the transactions violated § 1–203.

What has been decided with reference to Begay applies equally to Reeves.

Defendant violated the terms of § 9–504. Begay and Reeves were entitled to the surplus profit made by defendant. Defendant emerges as a creditor whose loan plus interest were paid in full. It cannot and it did not complain of the amount of surplus awarded Begay and Reeves. It is a business of long and broad experience as a pawn broker. It kept no books or records of the sales made of the jewelry. It should not plead that the trial court was without authority to allow interest from November 1, 1974. This is the proximate date that Begay and Reeves suffered their losses. Defendant has had the benefit and use of the money during this period of time. Its argument was feeble and without citation of authority. The point was adequately discussed in Briefs–In–Chief filed on behalf of Begay and Reeves. Not being meritorious, it deserves no response.

This appeal should be affirmed.